# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, TEXAS ASSOCIATION OF BUSINESS, and LONGVIEW CHAMBER OF COMMERCE,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION and LINA KHAN in her official capacity as Chair of the Federal Trade Commission,<br><br>*Defendants.* | **Case No. 6:24-cv-00148** |

## PLAINTIFFS' MOTION FOR STAY OF
## EFFECTIVE DATE AND PRELIMINARY INJUNCTION

1

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................7

BACKGROUND ........................................................................................................11

    A.    The Commission's Authority Under The
           Federal Trade Commission Act ........................................................11

    B.    Existing Regulation Of Worker Noncompete Agreements ...........................13

    C.    The Commission's Noncompete Rulemaking ................................................15

ARGUMENT ..............................................................................................................16

  I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS .........................16

    A.    The Noncompete Rule Exceeds The Commission's
           Statutory Authority .........................................................................16

           1.    The Commission Lacks The Authority To Prohibit
                 Unfair Methods Of Competition Through
                 Rulemaking (Count I) ................................................................17

           2.    The Commission's Classification Of All Noncompete
                 Agreements As "Unfair Methods of Competition" Is
                 Contrary To Section 5 (Counts II and III) ...........................23

           3.    The Commission's Rule Is Unlawfully Retroactive (Count IV) .........28

    B.    The Noncompete Rule Is The Product Of Flawed Decisionmaking ..............29

           1.    The Rule's Broad Ban Is Not Supported By Its
                 Limited Evidence .......................................................................29

           2.    The Rule Brushes Aside Superior Alternatives ...................................31

           3.    The Rule's Cost-Benefit Analysis Is Deeply Flawed .........................33

  II.    PLAINTIFFS WILL BE IRREPARABLY HARMED .........................................34

  III.  THE PUBLIC INTEREST SUPPORTS PRELIMINARY RELIEF ..................35

CONCLUSION ..........................................................................................................36

# TABLE OF AUTHORITIES

*Page(s)*

CASES:

*1-800 Contacts, Inc.* v. *FTC,*
1 F.4th 102 (2d Cir. 2021) ................................................................................................25

*Alabama Ass'n of Realtors* v. *HHS,*
141 S. Ct. 2485 (2021) ......................................................................................................27

*AMG Cap. Mgm't, LLC* v. *FTC,*
141 S. Ct. 1341 (2021) ......................................................................................................12

*Barnhart* v. *Sigmon Coal Co.,*
534 U.S. 438 (2002) ..........................................................................................................23

*Boise Cascade Corp.* v. *FTC,*
637 F.2d 573 (9th Cir. 1980) ...........................................................................................24

*Bowen* v. *Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) ..........................................................................................................28

*Bradford* v. *New York Times Co.,*
501 F.2d 51 (2d Cir. 1974) ..............................................................................................25

*Career Colleges and Schools of Texas* v. *U.S. Dep't of Educ.,*
2024 WL 1461737 (5th Cir. April 4, 2024) .....................................................................16

*Caremark Homecare, Inc.* v. *New England Critical Care, Inc.,*
700 F. Supp. 1033 (D. Minn. 1988) ................................................................................15

*Chrysler Corp.* v. *Brown,*
441 U.S. 281 (1979) ..........................................................................................................18

*Consultants & Designers, Inc.* v. *Butler Serv. Grp., Inc.,*
720 F.2d 1553 (11th Cir. 1983) .......................................................................................14

*DeSantis* v. *Wackenhut Corp.,*
793 S.W.2d 670 (Tex. 1990) ............................................................................................14

*E.I. Du Pont de Nemours & Co.* v. *FTC,*
729 F.2d 128 (2d Cir. 1984) ............................................................................................24

*Eastern Enters.* v. *Apfel,*
   524 U.S. 498 (1998)........................................................................................28, 29

*FCC* v. *Prometheus Radio Project,*
   592 U.S. 414 (2021)..................................................................................................4

*Gundy* v. *United States,*
   139 S. Ct. 2116 (2019)...........................................................................................28

*Huawei Techs. USA, Inc.* v. *FCC,*
   2 F.4th 421 (5th Cir. 2021) ...................................................................................29

*Humphrey's Executor* v. *United States,*
   295 U.S. 602 (1935)...............................................................................................19

*Impax Labs., Inc.* v. *FTC,*
   994 F.3d 484 (5th Cir. 2021) .................................................................................24

*Int'l Ladies Garment Workers' Union* v. *Donovan,*
   722 F.3d 795 (D.C. Cir. 1983)...............................................................................33

*King* v. *Burwell,*
   576 U.S. 473 (2015)...............................................................................................27

*Louisiana* v. *Biden,*
   55 F.4th 1017 (5th Cir. 2022).................................................................16, 22, 36

*Metropolitan Life Ins. Co.* v. *Massachusetts,*
   471 U.S. 724 (1985)...............................................................................................26

*Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce,*
   60 F.4th 956 (5th Cir. 2023) .................................................................................29

*Miles* v. *Apex Marine Corp.,*
   498 U.S. 19 (1990).................................................................................................26

*National Petroleum Refiners* v. *FTC,*
   482 F.2d 672 (D.C. Cir. 1973)...........................................................................22, 23

*NFIB* v. *OSHA,*
   595 U.S. 109 (2022)............................................................................................22, 27

*North Tex. Specialty Physicians* v. *FTC,*
   528 F.3d 326 (5th Cir. 2008) .................................................................................24

*Pierce* v. *Fuller,*
   8 Mass. 223 (1811) ................................................................................................14

*Restaurant Law Ctr.* v. *U.S. Dep't of Labor,*
    66 F.4th 593 (5th Cir. 2023) ........................................................34

*Seila Law LLC* v. *CFPB,*
    140 S. Ct. 2183 (2020)..............................................................19

*Snap-On Tools Corp.* v. *Fed. Trade Comm'n,*
    321 F.2d 825 (7th Cir. 1963) ....................................................25

*Southwestern Elec. Power Co.* v. *EPA,*
    920 F.3d 999 (5th Cir. 2019) ....................................................31

*Texas* v. *Biden,*
    10 F.4th 538 (5th Cir. 2021) .....................................................36

*Texas* v. *EPA,*
    983 F.3d 826 (5th Cir. 2020) .............................................29, 35

*United States Forest Service* v. *Cowpasture River Preservation Assn.,*
    140 S. Ct. 1837 (2020)..............................................................26

*Wages & White Lion Inv., LLC* v. *FDA,*
    16 F.4th 1130 (5th Cir. 2021)....................................................33

*West Virginia* v. *EPA,*
    597 U.S. 697 (2022)........................................................9, 22, 27

*Whitman* v. *American Trucking Ass'ns,*
    531 U.S. 457 (2001)..................................................................23

**STATUTES:**

5 U.S.C. § 705 ................................................................................7, 16

15 U.S.C. § 45 ......................................................................8, 9, 18, 27

15 U.S.C. § 46 ..................................................................9, 12, 17, 18

15 U.S.C. § 53 ...............................................................................12

15 U.S.C. § 57a .......................................................................13, 20

15 U.S.C. § 1194(c) .........................................................................13

Act of July 22, 1813, Ch. 16, § 4 ....................................................17

FTC Act Amendments of 1994, Pub. L. 103-312 ...........................21

Longshore and Harbor Workers' Compensation Act, ch. 509 (1927) ....................................18

Cal. Bus. & Prof. Code § 16600 ............................................................................................31

Mass. Gen. Laws Ann. ch. 149, § 24L(b)(iv)........................................................................15

Me. Rev. Stat. tit. 26, § 599-A(3) ..........................................................................................15

REGULATIONS:

*In re Matter of the Enhancement and Standardization of Climate-Related*
    *Disclosures for Investors,*
    No. S7-10-22 (Apr. 4, 2024) ..................................................................................36

OTHER AUTHORITIES:

FTC, *Policy Statement Regarding the Scope of Unfair Methods of*
    *Competition* (Nov. 2022) ..........................................................................9, 27, 28

John McAdams, *Non-Compete Agreements: A Review of the Literature,*
    FTC Bureau of Economics Research Paper (2019) ..........................................13

Maureen K. Ohlhausen & Ben Rossen, *Dead End Road:* National Petroleum
    Refiners *and FTC "Unfair Methods of Competition" Rulemaking,*
    Concurrences (2022) ........................................................................................22

Noah Joshua Phillips, *Against Antitrust Regulation,*
    Am. Enter. Inst. (2022) .....................................................................................12

Thomas W. Merrill & Kathryn T. Watts, *Agency Rules with the Force of*
    *Law: The Original Convention,*
    116 Harv. L. Rev. 467 (2002)..................................................................12, 18, 19

Pursuant to Local Rule CV-65 and Federal Rule of Civil Procedure 65, Plaintiffs move for a stay of effective date and preliminary injunction under the Administrative Procedure Act.  *See* 5 U.S.C. § 705.

## PRELIMINARY STATEMENT

Recognizing that a company is only as strong as its people, many businesses expend considerable time and resources training and developing their employees.  They also allow those employees access to highly sensitive, proprietary information.  Having invested in their people and entrusted them with valuable company secrets, those businesses have strong interests in preventing competitor businesses from free-riding on those investments or gaining improper access to confidential information.  For centuries, U.S. businesses have sought to protect those critical interests by entering into reasonable noncompete agreements with their employees.

Many businesses continue to rely on targeted noncompete agreements for these same reasons today.  Noncompetes typically require an employee to agree, as a condition of employment or in exchange for compensation, that if the employee decides to leave the company, he will not work for the employer's competitors for a limited period of time thereafter.  These agreements benefit employers and workers alike—the employer protects its workforce investments and sensitive information, and the worker benefits from increased training, access to more information, and a chance to bargain for higher pay.

Policymakers and courts have long understood the benefits of reasonable noncompete agreements.  At the same time, they have also recognized that some noncompetes may present an undue burden for some types of workers or impose overly broad restrictions—for instance, by preventing an employee from working for a firm

hundreds of miles away or many years after leaving a job.  And each State has developed its own body of law to strike what it believes is the right balance.  At the federal level, by contrast, Congress has never enacted a law regulating noncompetes.  And without any such authorizing legislation, federal agencies appropriately have never sought to regulate noncompetes on a nationwide basis.

Until now.  For the first time in its history, the Federal Trade Commission has issued a sweepingly broad rule addressing worker noncompete agreements on a nationwide basis, decreeing that nearly every one of them constitutes an "unfair method of competition" under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a).  By the Commission's own estimates, the Noncompete Rule will retroactively invalidate 30 million contracts, despite broad enforcement of those agreements under governing state laws.  And by categorically banning noncompetes going forward, the Rule will impose huge costs both on workers (by depriving them of the specialized training and additional compensation benefits such agreements can help secure) and on businesses (by forcing them to rely on burdensome and uncertain methods to protect their confidential business information).  Plaintiffs easily satisfy the requirements for an order staying the Noncompete Rule's effective date, preliminarily enjoining the Commission from enforcing it, or both.

*First*, Plaintiffs are overwhelmingly likely to prevail on the merits because the Commission has no authority to issue regulations prohibiting "unfair methods of competition."  For decades, the Commission has addressed unfair-competition practices through individual adjudications, applying standard antitrust principles to the facts of each case.  The Commission now claims that a seldom-used housekeeping provision of the FTC

Act, Section 6(g), actually grants a long-dormant power to issue substantive rules declaring business practices unlawful.  The text, context, structure, and history of Section 6(g) say otherwise.  And if there were any doubt, it would be resolved by the major-questions doctrine, which recognizes that Congress must "speak clearly if it wishes to assign an agency decisions of vast economic and political significance."  *West Virginia* v. *EPA*, 597 U.S. 697, 716 (2022).

Even if the Commission had the authority to engage in unfair-competition rulemaking, categorically prohibiting *all* worker noncompete agreements as "unfair methods of competition" cannot be squared with the meaning of that phrase in Section 5 of the FTC Act.  Under established law, a business practice is only unfairly competitive under Section 5 if it produces anticompetitive harm that outweighs any procompetitive benefits.  The Commission did not even attempt to make that showing for the entire class of noncompetes.  Instead the Commission relied on a radical reinterpretation of Section 5 in a 2022 "Policy Statement," under which a majority of the Commission can condemn conduct as "unfair" without having to show any actual harm to consumers or competition.  That novel interpretation of Section 5 is wrong on its own terms, upends the States' longstanding role in regulating noncompetes, and violates the major-questions doctrine.   The Commission's view also would make Section 5 so boundless as to reflect an unconstitutional delegation of legislative power from Congress.

Independent of those and other statutory defects, the Noncompete Rule is a textbook example of arbitrary and capricious decisionmaking.   The Administrative Procedure Act "requires that agency action be reasonable and reasonably explained."

*FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Here, the Commission adopted a sweeping, categorical rule that has no relationship to the existing evidence on noncompete agreements.  It ignored a range of narrower alternative proposals that would have achieved the Commission's purported objectives without imposing onerous burdens on workers and businesses.  And the Commission's cost-benefit analysis grossly undercounts the costs of the rule while crediting it with speculative benefits based on stale data.  Commenters explained each of those errors during the notice-and-comment period, but the Commission failed to address them.  For all of these reasons, Plaintiffs are highly likely to prevail on the merits of their challenge to the Noncompete Rule.

*Second*, Plaintiffs need immediate relief from this Court because the Noncompete Rule will cause irreparable harm to businesses and employees throughout this District and around the country.  The Rule takes effect roughly four months from now.  At that moment, virtually all existing noncompete agreements will instantly become unenforceable.  Parties that currently rely on noncompetes will be forced to choose between terminating those agreements or risking an enforcement action.  In the meantime, those existing agreements will be thrown into serious doubt, as parties now lack any assurance that their earlier bargain remains enforceable.  And companies will be reluctant to enter into noncompetes with new hires under the looming shadow of a Rule that deems those agreements unlawful.  Employers thus face the immediate burden of protecting their sensitive information with more expensive and less effective alternatives, notifying all employees with existing noncompetes, and assessing what kinds of agreements they may undertake.

*Third*, the balance of hardships and the public interest also favor interim relief. Issuing a stay of the Noncompete Rule's effective date and preliminarily enjoining its enforcement pending the resolution of this litigation will simply preserve a status quo that has been in place since the Founding.  State law, not federal law, has always governed the enforceability of noncompete agreements.  Allowing the Noncompete Rule to take effect and be enforced while this litigation is pending would thus be extremely disruptive to the public.  The Commission cannot remotely claim to suffer that type of harm or disruption. It has been nearly three years since President Biden's Executive Order instructing the Commission to curtail noncompete agreements, and the Commission itself delayed the Rule's effective date by four months.  Any harm to the Commission from maintaining the status quo is vastly outweighed by the harm to the public from allowing a likely unlawful and massively important regulation to unsettle a wide swath of the Nation's economy.

## BACKGROUND

### A.      The Commission's Authority Under The Federal Trade Commission Act

In the Federal Trade Commission Act of 1914, Congress "declared unlawful" "unfair methods of competition" and created the Commission to enforce that prohibition.  The FTC Act reflected two different views in Congress about how the Commission should carry out its role.  The House envisioned the Commission as a purely investigative body, which would gather information, produce reports, and make recommendations to the Attorney General to enforce suspected violations.  Meanwhile, the Senate envisioned the Commission as a separate enforcement agency that would itself enforce the antitrust laws through case-by-case adjudication.  Notably, there is no suggestion in the congressional debates that anyone in Congress believed the FTC would have substantive *rulemaking* authority.

11

What emerged was a combination of the two: the Senate-proposed enforcement powers became Section 5 of the Act, while the House-proposed investigative powers became Section 6. *See* Ex. A; Thomas W. Merrill & Kathryn T. Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 505 (2002)*;* Noah Joshua Phillips, *Against Antitrust Regulation*, Am. Enter. Inst. 2 (2022).  In Section 5, Congress authorized the Commission to pursue individual enforcement actions against alleged violators. 15 U.S.C. § 45(a)-(b).  The Commission may initiate administrative proceedings to obtain a cease-and-desist order or civil fines.  *Id.*; *see AMG Cap. Mgm't, LLC* v. *FTC*, 593 U.S. 67, 72-73 (2021).  The Commission may also seek injunctive relief in federal court if it determines that an unlawful practice is ongoing or imminent.  *See* 15 U.S.C. § 53(b).

In Section 6, titled "Additional powers," Congress authorized the Commission to undertake a number of other activities to further its enforcement authority, such as "gather[ing] and compil[ing] information," compelling parties to produce "annual or special" reports, and "investigat[ing]" violations of the antitrust laws that may be referred to the Attorney General.  15 U.S.C. § 46.  Relevant here, in Subsection (g)—which is titled "Classification of corporations; regulations"—Congress granted the Commission the power to "[f]rom time to time classify corporations and . . . *to make rules and regulations for the purpose of carrying out the provisions of this subchapter*."  *Id.* § 46(g) (emphasis added). The Commission contends that language grants the authority to promulgate not only housekeeping rules that are needed to "carry[] out" its other powers, but also substantive rules that enforce Section 5 by proscribing unfair methods of competition.

Congress has revisited the FTC Act many times since 1914. In 1938, Congress amended Section 5 to also declare "unfair or deceptive acts or practices" to be unlawful. Pub. L. 75-447, § 3. In 1975, Congress expressly authorized the Commission to issue binding regulations related to "unfair or deceptive acts and practices," but only after following detailed procedural requirements. Pub. L. 93-637, § 202 (codified at 15 U.S.C. § 57a). Congress has also expressly provided the Commission with narrow rulemaking authority over specific topics. *See, e.g.*, 15 U.S.C. § 1194(c) (providing that "violation[s] of such rules … shall be an unfair method of competition and an unfair and deceptive act or practice" under the FTC Act). Neither in 1975 nor at any time since has Congress expressly authorized the Commission to issue rules prohibiting "unfair methods of competition."

### B.      Existing Regulation Of Worker Noncompete Agreements

Many companies rely on noncompete agreements. By the Commission's own estimates, there are 30 million noncompetes in the United States today. *See* FTC, Non-Compete Clause Rule, RIN3084-AB74, at 14 (Apr. 23, 2024) (Final Rule). Reasonable noncompete agreements allow businesses to protect sensitive and confidential business information and give employers increased flexibility in compensation. They also benefit employees by incentivizing specialized training and development opportunities that would otherwise be unavailable. *See* John M. McAdams, *Non-Compete Agreements: A Review of the Literature*, FTC Bureau of Economics Research Paper 6 (2019).

Noncompetes are hardly a modern invention. They date back to the Founding and have been regulated exclusively by the States for centuries. *See, e.g.*, *Pierce* v. *Fuller*, 8 Mass. 223 (1811) (finding valid an early noncompete agreement involving stagecoaches between Boston and Providence). States have developed varying approaches to regulating

noncompetes and ensuring that they do not unduly restrict workers.  In many States, including Texas, a noncompete agreement will be enforced so long as it is "limited appropriately as to time, territory, and type of activity."  *See, e.g.*, *DeSantis* v. *Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990).  Some States are more restrictive, and have enacted statutes prohibiting noncompetes that apply beyond a certain length of time or to certain categories of workers.  *See, e.g.*,  Mass. Gen. Laws Ann. ch. 149, § 24L(b)(iv) (prohibiting noncompetes that "exceed 12 months"); Me. Rev. Stat. tit. 26, § 599-A(3) (prohibiting noncompetes for "employee[s] earning wages at or below 400% of the federal poverty level").  And although they represent a very small minority, some States—California, Oklahoma, North Dakota, and Minnesota—have enacted legislation treating noncompetes in the employment context as largely unenforceable.

In stark contrast, no federal law addresses the enforceability of noncompetes.  And as far as Plaintiffs are aware, no federal court has ever held that a noncompete agreement violated the federal antitrust laws.  Federal courts instead widely recognize that noncompetes serve a range of valid procompetitive objectives, *see Consultants & Designers, Inc.* v. *Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1559-1560 (11th Cir. 1983) (explaining that noncompetes have procompetitive benefits), and that individual noncompete agreements are unlikely to adversely affect any relevant market, *see Caremark Homecare, Inc.* v. *New England Critical Care, Inc.*, 700 F. Supp. 1033, 1035-1036 (D. Minn. 1988).  Tellingly, in declaring that noncompete agreements as a class are categorically "unfair methods of competition," the Commission did not cite a single judicial

decision holding that a noncompete agreement violated the FTC Act, the Sherman Act, or any other federal statute.

### C.      The Commission's Noncompete Rulemaking

Despite extensive case law and economic research confirming the benefits of reasonable noncompete agreements, the Commission in January 2023 proposed a rule that would enact a nationwide ban on those agreements.   Compl. ¶ 57.   The proposal was astoundingly broad.  It defined "non-compete clauses" to include any agreement that "has the effect of prohibiting [a] worker from seeking or accepting employment," and allowed no distinction for owners or partners of a business, or for employees based on seniority, their access to sensitive information, or the skill required to perform their jobs.  *Id.*

The Commission's proposed rule prompted swift pushback from businesses, workers, economists, and former governmental officials.  Small businesses filed comments explaining the importance of noncompete agreements to their operations and asked the Commission to abandon or revise its rule.  Economists explained that the Commission had overlooked or mischaracterized evidence showing that noncompetes promote competition and benefit workers.  And an array of groups—including Plaintiffs—showed that the Commission lacks authority under the FTC Act to issue a competition regulation of any kind or to categorically prohibit noncompete agreements.  Compl. ¶¶ 79-81.

On April 23, 2024, the Commission issued its final rule.  Despite the numerous objections raised during the comment period, the Commission's final rule changed little from the proposal.  *See* Final Rule 561-565.  The main substantive change was the adoption of a carve-out for existing (but not future) noncompetes with "senior executives," defined as workers making over $151,164 who hold a "policy-making position."  *Id.* at 563.

## ARGUMENT

The Noncompete Rule is an unlawful assertion of power that will impose widespread and substantial harms on businesses and employees across the country.  Applying the established requirements for preliminary relief, Plaintiffs are highly likely to succeed on the merits of their challenge, the Noncompete Rule is certain to cause irreparable injury absent a stay or injunction, and the balance of hardships and public interest strongly favor interim relief.  This Court should therefore stay the effective date of the Rule or preliminarily enjoin its enforcement (or both).  *See* 5 U.S.C. § 705; *Career Colleges and Schools of Tex.* v. *U.S. Dep't of Educ.*, 2024 WL 1461737, at \*7, 26 (5th Cir. April 4, 2024) (stay of effective date); *Louisiana* v. *Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022) (preliminary injunction).  Simply put, this Court should preserve the centuries-old status quo, and leave the enforceability of noncompete agreements to state rather than federal law, pending the resolution of this litigation.

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.

### A.    The Noncompete Rule Exceeds The Commission's Statutory Authority.

The FTC Act does not authorize the Noncompete Rule for three separate and independent reasons.  First, no provision of the FTC Act empowers the Commission to issue substantive, binding unfair-competition rules.  The Commission points to Section 6(g) as its source of authority, but that ancillary provision of the FTC Act cannot fairly be read to support such an expansive and unprecedented claim of regulatory power.  Second, Section 5 of the FTC Act cannot be read to allow the Commission to outlaw *all* noncompete agreements.  The Commission's contrary view rests on a reading of the statute that is divorced from history and precedent and would result in an unconstitutional delegation of

16

power from Congress to the Commission.  Third, at a minimum, the FTC Act contains no language authorizing retroactive rulemakings.  As a result, the Commission has no legal authority to wipe out millions of noncompetes that are currently in force.

**1.    The Commission Lacks The Authority To Prohibit Unfair Methods Of Competition Through Rulemaking (Count I).**

The Commission has no general, freestanding authority to issue substantive rules that bind private parties.  Unlike other agencies that Congress has authorized to write substantive rules addressing all matters under their jurisdiction, the Commission was not set up as a rulemaking body.  Instead, Congress gave it the power to (i) pursue individual enforcement actions against parties alleged to have violated the law, and (ii) investigate potential wrongdoing and publish reports.  Although Congress has since vested the Commission with specific rulemaking authority over certain matters, it has never done so for "unfair methods of competition."

a.    The Commission claims to have found general rulemaking authority in a single clause tucked within a provision setting forth its investigative powers.  Section 6(g) authorizes the Commission to "[f]rom time to time classify corporations and . . . *make rules and regulations for the purpose of carrying out the provisions of [the Act]*."  15 U.S.C. § 46(g) (emphasis added).  That formulation is markedly different from other statutes that for centuries have provided agencies with the power to issue binding substantive rules by saying so expressly.  *See, e.g.*, Act of July 22, 1813, Ch. 16 § 4, 3 Stat. 22, 26 (authorizing an agency to "establish regulations" that "shall be binding" on private parties).  To authorize legislative rulemaking, Congress also has historically prescribed sanctions for violations of the agency's rules, confirming that those rules create substantive obligations for regulated

parties.  *See, e.g.*, Longshore and Harbor Workers' Compensation Act, ch. 509, Pub. L. 69-803 (1927); *see generally* Merrill & Watts, *supra*, at 494-495.  By contrast, when a rulemaking provision does not indicate that the agency may issue substantive regulations that will bind the public—as is true of Section 6 of the FTC Act—the provision is "simply a grant of authority to the agency to regulate its own affairs."  *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 309 (1979).

The surrounding context confirms that Section 6(g) does not give the Commission substantive rulemaking authority.  *See Utility Air Reg. Grp.* v. *EPA*, 573 U.S. 302, 321 (2014) ("Reasonable statutory interpretation must account for both 'the specific context in which … language is used' and 'the broader context of the statute as a whole.' ") (quoting *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 341 (1997)).  Section 6(g) begins with the power to "[f]rom time to time classify corporations."  After granting that mundane power, Congress did not slip in substantive rulemaking authority over all business practices in the American economy.  Moreover, Section 6(g) is the seventh in a list of twelve lettered subsections setting forth "[a]dditional powers" of the Commission, which largely consist of investigative authorities to request information and produce reports.  Section 6 does not mention Section 5 or any other substantive authority.  And it provides no standards to guide the Commission's exercise of authority—like the "public interest" standard that applies to enforcement actions under Section 5.  15 U.S.C. § 45(b).  All of that makes sense only if Section 6(g) does not confer the power to issue substantive rules that bind private parties.

b.     The history of the FTC Act further confirms that Section 6(g) does not provide substantive rulemaking authority.  Section 6 emerged from an agreement between

18

those who wanted the FTC to pursue its own enforcement actions (which was ultimately reflected in Section 5) and those who wanted the FTC to serve as a purely investigative body (a vision reflected in Section 6). *See* pp. 11-12, *supra*. Neither camp even suggested giving the Commission the power to issue legislative rules that would bind businesses across every sector of the economy.

In fact, both during and after the Act's passage, all three Branches expressly stated their view that the Commission *lacked* rulemaking authority. Representative Covington advocated for the FTC Act on the House floor by arguing that the Commission would "not be exercising power of a legislative nature." Merrill & Watts, *supra*, at 506 (quoting 51 Cong. Rec. 14,932 (1914)). Shortly after the law was passed, the Commission itself wrote to Congress that "[o]ne of the most common mistakes is to suppose that the [Commission] can issue orders, rulings, or regulations unconnected to any proceedings before it." *Id.* (quoting Annual Report of the Federal Trade Commission 36 (1922)). That understanding was echoed by Attorney General Jackson in his Final Report on the APA. *Id.* And in resolving a constitutional challenge to the Commission's structure in 1935, the Supreme Court explained that Section 6 only authorized the Commission to "mak[e] investigations and reports thereon for the information of Congress." *Humphrey's Executor* v. *United States*, 295 U.S. 602, 627-628 (1935); *see Seila Law LLC* v. *CFPB*, 140 S. Ct. 2183, 2200 (2020) (distinguishing the Commission from the CFPB Director because, "[i]nstead of making reports and recommendations to Congress, as the 1935 FTC did, the Director possesses the authority to promulgate binding rules"). The consensus understanding has long been that Section 6(g) does not authorize substantive rules.

c.     Congress's subsequent amendments to the FTC Act provide yet further confirmation that Section 6(g) does not grant the Commission general substantive rulemaking authority.  First, Congress has enacted a series of targeted amendments to the FTC Act that expressly allow rulemaking related to specific subjects, like product labeling or dangerous items in the marketplace.  *See, e.g.*, Pub. L. 90-189, § 4 (1967) (authorizing binding rules related to flammable fabrics).  Those statutes would have been entirely unnecessary if Section 6(g) already empowered the Commission to make substantive rules.

Second, in the Magnuson-Moss Act of 1975, Congress granted the Commission rulemaking authority related to "unfair or deceptive acts and practices"—but *not* "unfair methods of competition."  15 U.S.C. § 57a(a).  And Congress imposed extensive procedural requirements before the Commission could issue any rules related to unfair and deceptive acts or practices.  *See, e.g.*, 15 U.S.C. § 57a(b)(2) (requiring "advance notice" of the proposed rule to a congressional committee).  It is implausible that Congress expressly granted substantive rulemaking authority subject to procedural hurdles for "unfair and deceptive acts or practices," while implicitly allowing the Commission to make binding "unfair method of competition" rules at will.

Third, Congress again revisited the Commission's rulemaking authority in 1994, codifying the substantive analysis the agency must undertake when defining "unfair or deceptive acts and practices."  *See* Pub. L. 103-312, § 9; S. Rep. 103-130 at 12.  Again, Congress gave no indication that it believed the Commission could issue rules defining "unfair methods of competition."  *See* H.R. Rep. 103-138, at 4 (Commission's authority related to "unfair methods of competition is "limited … to case-by-case adjudication").

20

Congress has thus repeatedly acted against the backdrop that the Commission does not have substantive rulemaking authority under Section 6(g), and Congress has granted and defined other rulemaking authority—without ever authorizing unfair-competition rulemaking.

     d.     Any doubt about the meaning of Section 6(g) is resolved by the major-questions doctrine.  It is hard to imagine a more major question than whether an agency may afford itself rulemaking authority to decide what constitutes fair competition throughout the entire country.  This case shows how awesome that power is:  by a vote of 3-2, the Commission has overridden the laws of at least 46 States and declared tens of millions of noncompete agreements unenforceable, no matter the ends they serve or what benefits employees bargained for or have received.  And of course if the Commission may declare that all noncompetes are unfair methods of competition, it may take the same approach to any other business practice or category of conduct.  The Commission's approach would upend decades of its own case-by-case adjudication, not to mention (as here) potentially centuries of state law.  The Commission does not have anything remotely resembling clear congressional authorization to assert powers of such vast "political and economic significance." *Biden*, 55 F.4th at 1033; *see West Virginia*, 597 U.S. at 716; *NFIB* v. *OSHA*, 595 U.S. 109, 117 (2022).

     If more were needed, the Commission has "claim[ed] to discover" this "unheralded power" in a "long-extant statute." *Biden*, 55 F.4th at 1033.  Section 6(g) is tucked away in a minor part of the FTC Act that relates to investigative powers, and it includes no reference to any substantive power of the Commission.  The Commission itself understood

Section 6(g)'s limited scope for decades, and did not attempt to issue a rule under that provision until fifty years after the FTC Act's passage.  *See* p. 19, *supra*.  To be sure, the Commission experimented with a short-lived effort to issue joint deceptive-practices and unfair-competition rules in the 1960s and 1970s, *see* Final Rule 25-28—which prompted Congress to clarify the Commission's rulemaking authority through the Magnuson-Moss Act, which conferred such authority *only* for unfair or deceptive acts or practices.  Since that time, the Commission has never until now relied on Section 6(g) as a source of substantive rulemaking authority.  *See generally* Maureen K. Ohlhausen & Ben Rossen, *Dead End Road:* National Petroleum Refiners *and FTC 'Unfair Methods of Competition' Rulemaking*, Concurrences (2022).

e.      The Commission largely relies on a single decision to defend its claim of rulemaking authority: *National Petroleum Refiners* v. *FTC*, 482 F.2d 672 (D.C. Cir. 1973).  *See* Final Rule 29-30.[*]  *National Petroleum Refiners* is a relic of a bygone era that was wrong at the time and is obviously so now.  In holding that Section 6(g) "empowered [the Commission] to promulgate substantive rules of business conduct," *National Petroleum Refiners* rested heavily on the fact that Congress had not expressly *excluded* that authority.  482 F.2d at 673, 686.  That gets it exactly backward.  Agencies do not have unlimited power to accomplish their policy preferences up to the point that Congress stops them; they have only the powers that Congress grants through a "textual commitment of authority."

---

[*]  The only other decision cited in the Rule "incorporated" *National Petroleum Refiners* "by reference" on the ground that "Congress [did not] intend[]" "the issue of Section 6(g) rulemaking power" "to be litigated each time the Commission seeks to enforce a trade regulation rule."  *United States* v. *JS&A Grp., Inc.*, 716 F.3d 451, 454 (7th Cir. 1983).

*Whitman* v. *American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  And under the major-questions doctrine, the more important the agency's claim of authority, the clearer must be the textual commitment.

The court of appeals in *National Petroleum Refiners* also reasoned that its "duty [was] to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment."  482 F.2d at 689.  That policy-based reasoning should have cut the other way:  in 1914, Congress designed Sections 5 and 6 to grant adjudicative and investigative powers, but not substantive rulemaking authority.  But in any event, the perils of the D.C. Circuit's thumb-on-the-scale approach are one reason why today courts "will not alter the text in order to satisfy the policy preferences" of the Commission.  *Barnhart* v. *Sigmon Coal Co.*, 534 U.S. 438, 462 (2002).  Whatever persuasive authority *National Petroleum Refiners* might have had in 1973 has long since evaporated.  Perhaps that is why the Commission had not relied on it for the last half-century until this Rule.

### 2. The Commission's Classification Of All Noncompete Agreements As "Unfair Methods Of Competition" Is Contrary To Section 5 (Counts II and III).

The Commission's lack of substantive rulemaking authority under Section 6(g) is alone sufficient to show that Plaintiffs are likely to prevail on the merits.  Even if, however, the Commission may make rules to govern "unfair methods of competition," the Noncompete Rule is still unlawful.  It has long been settled that to constitute an "unfair method of competition" under Section 5, the conduct at issue must harm competition more than help it.  Some individual noncompete agreements may impose harms that are not

outweighed by procompetitive benefits, but plainly not all of them do.  Accordingly, the Commission could not simply declare all noncompetes *per se* unlawful under Section 5.

a. "It is the function of the court[s] to determine the scope" of the phrase "unfair methods of competition."  *E.I. Du Pont de Nemours & Co.* v. *FTC*, 729 F.2d 128, 136 (2d Cir. 1984) (*Ethyl*).  Courts interpreting that provision have been careful to draw a line "between conduct that is anticompetitive and legitimate conduct that has an impact on competition." *Id.* at 138.  To do so, they have consistently required the Commission to prove in each case that the challenged conduct (i) produces anticompetitive effects, *see, e.g.*, *North Tex. Specialty Physicians* v. *FTC*, 528 F.3d 346, 362-363 (5th Cir. 2008); *Ethyl*, 729 F.2d at 141; and (ii) is not offset by legitimate business justifications that benefit competition, *see, e.g.*, *Impax Labs., Inc.* v. *FTC*, 994 F.3d 484, 497 (5th Cir. 2021); *Ethyl*, 729 F.2d at 140. Under this settled interpretation of Section 5, in order to show that *all* noncompete agreements constitute "unfair methods of competition," the Commission was required to show that every noncompete agreement causes competitive harm that is not outweighed by procompetitive benefits.

The Commission did not even try to show that all noncompete agreements do more competitive harm than good.  Instead the Commission argued that noncompetes harm competition in the *aggregate*.  *See* Final Rule 132-135.  But courts have correctly rejected that type of aggregated approach.  *See, e.g.*, *Boise Cascade Corp.* v. *FTC*, 637 F.2d 573, 582 (9th Cir. 1980) ("[T]o allow a finding of a Section 5 violation on the theory that the mere widespread use of [a] practice[] makes it [unlawful] would blur the distinction between guilty and innocent commercial conduct.").  If some noncompetes harm competition and

24

others do not, only the former are "unfair methods of competition" prohibited by Section 5. *See Snap-On Tools Corp.* v. *Fed. Trade Comm'n*, 321 F.2d 825, 837 (7th Cir. 1963) ("[Noncompete agreements] are legal unless they are unreasonable as to time or geographic scope; but even if this restriction is unreasonable as to geographic scope, we are not prepared to say that it is a per se violation of the antitrust laws."); *Bradford* v. *New York Times Co.*, 501 F.2d 51, 59 (2d Cir. 1974) (explaining that "no court applying the rule of the reason has ever held [a noncompete to be] violative of Section 1 of the Sherman Act").

Nor did the Commission attempt to show that the supposed anticompetitive effects of noncompete agreements are not offset by procompetitive benefits—such as promoting investments in specialized workforce training or protecting businesses' sensitive information. Under Section 5, if the procompetitive benefits of a defendant's conduct outweigh its anticompetitive harm, that conduct is not unfair. *See 1-800 Contacts, Inc.* v. *FTC*, 1 F.4th 102, 114 (2d Cir. 2021). The Commission acknowledged that noncompetes serve many legitimate business interests, Final Rule 283, but it never attempted to show that those benefits were outweighed by the anticompetitive harms for every noncompete agreement prohibited by its Rule. *See id.* at 282. Simply put, Section 5 does not allow the Commission to designate a common business practice as "unfair" if only *some* instances of that practice unjustifiably harm competition. The Commission must narrow its regulation to capture only the "methods of competition" that are actually unfair.

b. Again, if there were any doubt about the meaning of Section 5, several settled interpretive principles would resolve it. Courts "assume that Congress is aware of existing law" at the time it enacts a statute. *Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 32 (1990).

25

Noncompete agreements date back to the Founding, and there is no indication that Congress in 1914 intended for the Commission to outlaw a common and well-accepted business practice. Moreover, Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power," *United States Forest Service* v. *Cowpasture River Preservation Assn.*, 590 U.S. 604, 622 (2020)—particularly when it is acting in an area of "traditional state regulation," *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724, 740 (1985). Here, States have regulated noncompete agreements since the beginning of the Republic, and federal law has had nothing to say on the subject. The Commission's Noncompete Rule now overrides the laws of at least 46 States, replacing case-specific or context-dependent judgments with a blunt federal rule that virtually all noncompetes are unlawful.

In addition, as with its reading of Section 6, the Commission's interpretation of Section 5 runs headlong into the major-questions doctrine. By the Commission's lights, the Rule would affect every industry in America—instantly altering the contractual relationships between millions of businesses, employees, independent contractors, and partners—based on across-the-board generalizations of what practices a majority of Commissioners believes are "unfair." *See NFIB*, 595 U.S. at 117; *King* v. *Burwell*, 576 U.S. 473, 485-486 (2015). And it would allow the agency to substitute its judgment for that of Congress, which has consistently declined to enact noncompete legislation for years, as well as the States, which have regulated (and widely enforced) noncompetes. *See West Virginia*, 597 U.S. at 731-732; *Alabama Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 764 (2021) (explaining

that the major-questions doctrine applies when an agency "intrudes into an area that is the particular domain of state law").  Congress has not authorized any of this, let alone clearly.

      c.      Finally, if the Commission's interpretation of "unfair methods of competition" were correct, Section 5 would amount to an unconstitutional delegation of legislative power. To excuse its failure to show that all noncompetes cause unjustified competitive harm, the Noncompete Rule relies on the Commission's interpretation of "unfair methods of competition" adopted in a 2022 Policy Statement.  *See* Final Rule 55-57.  Breaking with decades of case law interpreting Section 5, that Policy Statement says that the Commission may determine that conduct violates Section 5 so long as three requirements are satisfied: (i) it is "undertaken by an actor in the marketplace," (ii) it is "coercive, exploitative, collusive, abusive, deceptive, predatory, or involve[s] the use of economic power of a similar nature," and (iii) it "tend[s] to negatively affect competitive conditions" by, for example, "impair[ing] the opportunities" of a competitor.  *Id.*; FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition* 8-9 (Nov. 2022) (Policy Statement).

      If those vague requirements are all that is necessary to declare a business practice unlawful, then there are no meaningful guardrails on the Commission's power.  It has a roving mandate to condemn any commercial conduct that is "exploitative" and "tend[s] to negatively affect competitive conditions."  It does not need to show any evidence of actual harm, define a relevant market or prove market power, or consider procompetitive justifications.  Indeed, the Commission goes so far as to claim that it can prohibit any conduct that violates "the spirit of the antitrust laws," so long as that conduct "limit[s] choice" or "impair[s] other market participants."  Policy Statement, at 9-10.  Understood

**Case 6:24-cv-00148-JCB   Document 12   Filed 04/24/24   Page 28 of 38 PageID #:  109**

that way, Section 5 lacks any "intelligible principle" to guide the Executive's discretion. *Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019). If the Commission's interpretation of Section 5 were correct, it would amount to an unconstitutional delegation of legislative power, which provides yet another reason to set aside the Commission's rule.

### 3. The Commission's Rule Is Unlawfully Retroactive (Count IV).

At a minimum, the Commission's attempt to invalidate all existing noncompetes exceeds its authority. "Retroactivity is generally disfavored in the law, in accordance with fundamental notions of justice that have been recognized throughout history." *Eastern Enters.* v. *Apfel*, 524 U.S. 498, 501 (1998) (internal quotations omitted). In light of that core principle, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules." *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Agencies seeking to issue rules with retroactive effect must point to clear congressional authorization to do so. *Id.*

Here, the Commission did not even attempt to identify a clear congressional authorization to engage in retroactive rulemaking, and there is none. The Noncompete Rule nonetheless voids nearly all existing noncompetes, even if the party attempting to enforce the contract bargained for that protection in return for valuable consideration. *See* Final Rule 343. For instance, a small business that shared vital proprietary information with or provided specialized training to an employee who signed a noncompete could not stop the employee from taking those secrets or training to a competitor. Even assuming Section 6(g) authorizes the Commission to issue unfair-competition regulations, nothing in that provision blesses the Commission's attempt to retroactively unwind private contracts. This Court should avoid the serious questions that arise under the Fifth Amendment when

the government imposes retroactive burdens that "deprive citizens of legitimate expectations and upset settled transactions." *Eastern Enters.*, 524 U.S. at 533.

### B.    The Noncompete Rule Is The Product Of Flawed Decisionmaking.

In addition to lacking statutory authority for the Noncompete Rule, the Commission violated the APA in adopting it.  "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made," and "consider[s] whether the [agency's] decision was based on a consideration of the relevant factors." *Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023).  An agency's decisionmaking is arbitrary and capricious when it reflects a "clear error of judgment," *Texas* v. *EPA*, 983 F.3d 826, 835 (5th Cir. 2020); "fails to respond to significant points [or] consider all relevant factors raised by the public comments," *Huawei Techs. USA, Inc.* v. *FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (internal quotations omitted); or "rests on a serious flaw" in the agency's "cost-benefit analysis," *id.* at 452.

Here, the Commission fell short of the APA's standard of reasoned decisionmaking in three ways.  First, the Commission adopted a sweeping, categorical rule that has no relationship to the existing evidence on noncompete agreements.  Second, the Commission ignored a range of narrower alternative proposals that would have achieved the Commission's purported objectives without imposing onerous burdens on workers and businesses.  Third, the Commission's cost-benefit analysis grossly undercounts the costs of the rule while crediting it with speculative benefits based on stale data.

### 1.    The Rule's Broad Ban Is Not Supported By Its Limited Evidence.

The Noncompete Rule defines "non-compete clause" to cover every "term or condition of employment that prohibits a worker from, penalizes a worker for, or functions

to prevent a work from . . . seeking or accepting work [or] operating a business" in the United States.   Final Rule 561-562.   It draws no distinction between employees and independent contractors.   *Id.* at 563-564.   It sweeps in some nondisclosure agreements that the Commission believes "function" in a manner similar to a noncompete.   *Id.* at 77-79.   And it applies by its terms to senior executives making millions per year.   No longer could any company grant a researcher access to sensitive information in return for the promise not to join a competitor for a reasonable period of time, or pay lucrative compensation to a CEO or CFO in return for the promise not to take the company's sensitive information to a competitor for some reasonable period.

None of the evidence cited by the Commission could justify such a sweeping rule. The Commission relies on a handful of studies that examined the economic effects of various state policies toward noncompetes.   *See* Final Rule 107.   But no State has ever adopted a rule as broad as the Commission's.   Even California, for example, defines noncompetes more narrowly than the Commission's functional test.   *See* Cal. Bus. & Prof. Code § 16600. Moreover, many of the studies relied on by the Commission compared different States' approaches to enforcing noncompetes on particular facts.   *See* Final Rule 136-138.   Those studies therefore have nothing to say about whether a *categorical* ban—where no noncompete is enforced under any circumstances—is preferable to a more targeted approach.   Without those studies, the Commission has no reasoned basis for imposing its sweeping ban on noncompetes—particularly because it has no enforcement record related to noncompetes before 2023.   *See* Final Rule 39 n. 215.

The Commission's categorical ban is even more indefensible in light of the extensive body of judicial decisions and economic literature showing that reasonable noncompetes promote competition.  *See* pp. 13-15, *supra*.  The Commission has no real response.  It argues that because some evidence shows that noncompetes are harmful in the aggregate, all noncompetes should be banned.  *See* Final Rule 132-135, 282.  That is a *non sequitur*.  If some noncompetes harm competition and others do not, then the Commission needs a reasoned basis for painting with a broad brush rather than targeting those noncompete agreements that are actually harmful.  Simply put, the Commission has put forward nothing that would justify deeming *all* noncompetes to be harmful.  Because the Commission's Noncompete Rule is not supported by "the evidence recounted in the final rule," it reflects arbitrary and capricious decisionmaking.  *Southwestern Elec. Power Co.* v. *EPA*, 920 F.3d 999, 1019 (5th Cir. 2019).

### 2.     The Rule Brushes Aside Superior Alternatives.

Commenters offered various alternatives that would allow the Commission to achieve its aims at lower cost.  For example, many commenters proposed replacing the Rule's categorical ban with a case-by-case approach.  That proposal was consistent with state courts' longstanding approach to assessing noncompetes and the economic literature showing that noncompetes are often procompetitive (as well as the Commission's own historical practice when enforcing Section 5).  But the Commission rejected that alternative, arguing that a case-by-case approach would not allow enforcers to address the use of noncompetes "in the aggregate."  Final Rule 428-434.  Notably, that argument effectively concedes that many agreements would be enforceable under a case-by-case test.  *Id.* at 431.

Yet the Commission made no attempt to explain why it was sensible to wipe out potentially millions of agreements that even the Commission does not think would harm competition.

Commenters also proposed a host of other alternatives.  Plaintiff U.S. Chamber proposed amending the Rule to exclude independent contractors and severance agreements.  *See* U.S. Chamber of Commerce Comment Letter on Non-Compete Clause Rule 44-45 (Apr. 17, 2023).  The Investment Adviser Association asked for the Rule to apply prospectively, with an 18-month transition period.  *See* Investment Adviser Association Assistants Comment Letter on the Non-Compete Clause Rule 2-3 (Apr. 17, 2023).  And even some groups that were generally hostile to noncompetes asked the Commission to adopt a narrower rule that would require employees to show a "compelling business interest" for enforcing such an agreement.  *See* American Academy of Anesthesiologist Assistants Comment Letter on the Non-Compete Clause Rule 1 (May 3, 2023).

Still more commenters proposed specific exclusions or exemptions from the Rule.  The Small Business Legislative Council asked for the Rule to clearly exclude moonlighting and non-solicitation clauses.  *See* Small Business Legislative Council Comment Letter on the Non-Compete Clause Rule 3-4 (Apr. 19, 2023).  Healthcare organizations requested exemptions for healthcare professionals, doctors, and senior hospital executives.  *See* Stamford Health Comment Letter on the Non-Compete Clause Rule 5 (Apr. 1, 2023); Texas Hospital Association Comment Letter on the Non-Compete Clause Rule 2 (Apr. 19, 2023).  And other industry groups asked for narrow exemptions relevant to their field, such as an exemption for highly paid on-air television personalities.  *See* National Association of Broadcasters Comment Letter on the Non-Compete Clause Rule 16 (Apr. 19, 2023).

The Commission summarily rejected each of these proposals based on little more than *ipse dixit*—single-sentence, unexplained assertions that employers had other means for protecting their interests, *see* Final Rule 364 (discussing industries with apprenticeships), or that business justifications were not sufficient to outweigh the supposed harms, *see id.* at 361. The casual flippancy with which the Commission dismissed alternatives to a categorical ban is truly remarkable, given the breadth and magnitude of the Noncompete Rule. At bottom, the Commission failed to adequately explain why it adopted its chosen rule over those "less disruptive alternatives," *Wages & White Lion Inv., LLC* v. *FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021), many of which were "obvious[ly] respons[ive] to the concerns expressed by the" Commission. *Int'l Ladies Garment Workers' Union* v. *Donovan*, 722 F.3d 795, 817 (D.C. Cir. 1983).

### 3. The Rule's Cost-Benefit Analysis Is Deeply Flawed.

Although the Commission acknowledged some of the Rule's costs—such as the substantial compliance costs for businesses, *see* Final Rule 488-497—it failed to consider others. The Commission waved away the litigation costs that businesses are certain to incur when relying on trade-secret suits to protect their information, reasoning that those costs "are not quantifiable." Final Rule 453. Most importantly, the Commission dismissed the cost of businesses' inability to protect their confidential information, assuming (without evidence or analysis) that firms can rely on other tools like nondisclosure agreements to achieve a similar level of protection. *Id.* at 532-33. But the Commission acknowledged elsewhere in its Rule that its broad definition of "Non-Compete Clause" may sweep in nondisclosure agreements. *Id.* at 78-79. The Commission cannot simultaneously claim that

nondisclosure agreements are a viable tool to offset the costs of the Rule while also adopting a regulation that would invalidate many of them.

The Commission's assessment of benefits was equally flawed.  As discussed above, the Commission's projected benefits relied largely on a number of studies examining the economic effects of different state policies, even though no State has ever adopted a policy as restrictive as the Noncompete Rule.  And those studies are based on methodological flaws that were thoroughly explained to the Commission during the comment period.  *See, e.g.*, Kristina M. L. Acri *et al.*, Comment Letter on Non-Compete Clause Rule 1-2 (April 19, 2023).  The data underlying those studies are also now quite stale; even the Commission acknowledged that many of its conclusions were based on datasets that ended in 2009 or 2014.  *See* Final Rule 461, 467 n.1113.  But it failed to appreciate that changes to state law call into question the rationale for a categorical ban in the first place.  If current state laws are already weeding out unreasonable noncompetes, there is no benefit to a federal rule that wipes out reasonable and procompetitive noncompetes as well.

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED.

"Complying with a regulation later held invalid almost *always* produces … irreparable harm."  *Texas* v. *EPA*, 829 F.3d 405, 435 (5th Cir. 2016).  This is so even if the "specific dollar amount" of harm from compliance cannot be stated; irreparable harm "requires only that alleged compliance costs must be 'more than *de minimis.*'"  *Restaurant Law Ctr.* v. *U.S. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023).  Here, the harms from the Noncompete Rule will be immediate and severe.  Even before the Rule goes into effect, businesses cannot reasonably rely on their existing noncompetes or enter into new ones with current employees or new hires under the looming shadow (and accompanying threat

of enforcement) of a Rule deeming those agreements unlawful.  *See* Texas Association of Business Decl. ¶¶ 8-9 (Ex. B); Longview Chamber Decl. ¶¶ 10-12 (Ex. C).  Employers thus face the immediate burden of protecting their sensitive information with more expensive and less effective alternatives and assessing what kinds of agreements they may undertake.

On the day that the Rule takes effect, millions of workers and businesses will instantly lose bargained-for contractual protections.  Employers will need to take on the "administrative and labor costs associated with issuing notices that noncompete agreements cannot be enforced and changing company policies."  U.S. Chamber Decl. ¶ 10 (Ex. D).  Countless parties will be left in the lurch, wondering if they will continue to receive the benefits (such as a higher salary or a share of a business's profits) conditioned on a now-invalid agreement.  *See* Highland Landscaping Decl. ¶ 6 (Ex. E) (discussing "employee training program[s]" protected by noncompetes).  And going forward, workers and businesses will be unable to rely on noncompetes to protect investments in specialized training opportunities or to avoid free-riding by competitors.  *See* Alloy Precision Technologies Decl ¶ 7 (Ex. F) (explaining that competitors have previously tried to poach employees "after the company has incurred the substantial expenses of workforce training").  Those burdens readily constitute "harm for which there is no adequate remedy at law," *Biden*, 55 F.4th at 1033-1034 (citations omitted), and obtaining preliminary judicial relief before the Rule takes effect is the only way to avoid them.

## III.   THE PUBLIC INTEREST SUPPORTS PRELIMINARY RELIEF.

"There is generally no public interest in the perpetuation of unlawful agency action." *Texas* v. *Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of U.S.*

v. *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see Nken* v. *Holder*, 556 U.S. 418, 435 (2009) (explaining that the balance of hardships and public interest "merge when the Government is the opposing party").  Moreover, a stay and injunction here would preserve the status quo:  every State will continue to police noncompete agreements under its own body of law, and state and federal policymakers will continue to debate the appropriate approach to noncompete agreements.  Nor can the Commission claim to be meaningfully harmed by its inability to enforce during the pendency of this litigation a Rule that it took years to complete and that claims a vast and novel power.

The Commission's decision to postpone the effective date of the Rule for roughly four months does not change the calculus.  That delayed effective date does not help regulated parties, who do not know whether their current agreements will be enforceable and cannot reasonably negotiate or maintain such agreements knowing they may soon be unenforceable.  In fact, in light of the importance of the Rule and the number of agreements it stands to affect, Plaintiffs urged the Commission to enter its own stay pending the outcome of this litigation.  *See, e.g.*, Order Issuing Stay, *In re Matter of the Enhancement and Standardization of Climate-Related Disclosures for Investors*, No. S7-10-22 (Apr. 4, 2024).  Because it has refused to do so, and because a stay and preliminary injunction are the only way to ensure that the Rule receives full judicial review before it goes into effect, the public interest favors granting immediate interim relief.

## CONCLUSION

Plaintiffs respectfully request that the Court issue an order staying the Rule's effective date, preliminarily enjoining its enforcement, or both.

Dated:  April 24, 2024

Jordan L. Von Bokern (*pro hac vice*)
Tyler S. Badgley (*pro hac vice*)
U.S. CHAMBER LITIGATION
  CENTER
1615 H Street NW
Washington,  D.C.  20062
Tel:  (202) 463-5337
jvonbokern@uschamber.com
tbadgley@uschamber.com

Liz Dougherty*
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Washington, DC 20024
202-872-1260
ldougherty@brt.org


*  *Pro hac vice pending*

 /s/ *Michael E. Jones*
Michael E. Jones (Texas Bar No.:
10929400)
Shaun W. Hassett (Texas Bar No.:
24074372)
POTTER MINTON, PC
102 North College Avenue
Suite 900
Tyler, TX 75702
Tel: (903) 597-8311
mikejones@potterminton.com
shaunhassett@potterminton.com

Jeffrey B. Wall (*pro hac vice*)
Judson O. Littleton (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com

*Counsel for Plaintiffs Chamber of
Commerce of the United States of
America, Business Roundtable, Texas
Association of Business, and Longview
Chamber of Commerce*

37

## CERTIFICATE OF CONFERENCE

I hereby certify that on April 24, 2024, Jeffrey B. Wall and Judson O. Littleton, who are counsel for plaintiffs, conferred by telephone and email with Rachael L. Westmoreland and other counsel for defendants, regarding plaintiffs' intention to file this motion.  No agreement could be reached by the parties because defendants disagree with plaintiffs' contention that a stay or preliminary injunction is warranted.  The discussions conclusively ended in an impasse, leaving the issue of whether a stay or preliminary injunction should be issued in this case for the Court to resolve.

*/s/ Michael E. Jones*
Michael E. Jones

*Counsel for Plaintiff Chamber of Commerce of the United States of America, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce*